**AFFIDAVIT**

1.     I, Scott Rochefort, depose and make this affidavit in support of a complaint

against Oscarlin Peguero Ortiz for knowingly and intentionally possessing with the intent to

distribute a mixture and substance containing heroin and fentanyl, Schedule I and II controlled

substances, respectively, and a mixture and substance containing a detectable amount of cocaine

base, a Schedule II controlled substance, in violation of Title 21, United States Code, Section

841(a)(1), and aiding and abetting such conduct in violation of Title 18, United States Code,

Section 2.

2.     I am a Special Agent with the United States Drug Enforcement Administration

("DEA") and have been so employed since October 2010. I am currently assigned to the DEA's

Bangor, Maine, Post of Duty, within the New England Field Division. While employed with the

DEA, I have received specialized training in narcotics enforcement and investigations, the

investigation of various crimes which arise from drug trafficking activities, and drug

identification at the Drug Enforcement Training Facility at Quantico, Virginia. I have conducted

and participated in investigations relating to the distribution of controlled substances, including

cocaine, cocaine base, heroin, fentanyl, methamphetamine, diverted pharmaceuticals, and other

substances in violations of federal anti-drug laws, including Title 21, United States Code,

Sections 841 and 846. I have conducted or participated in, among other things, surveillance,

undercover transactions, the execution of search and arrest warrants, debriefing of informants

and confidential sources, and reviews of taped/recorded conversations relating to narcotics

trafficking. I am very familiar with the habits, methods, routines, practices, and procedures

commonly employed by persons engaged in the trafficking of illegal drugs.

Page **1** of **8**

3.      I am authorized to investigate violations of the laws of the United States, to execute warrants issued under the authority of the United States, to seize property, and to make arrests for violations of the Controlled Substances Act. I know that knowingly and intentionally possessing controlled substances with the intent to distribute those substances is illegal under Title 21 of the United States Code.

4.      This affidavit is based upon information gained from my personal observations, investigation, training, research and experience, and information obtained from conversations with, and reports or affidavits prepared by, other law enforcement officers and agents involved in this investigation. I have included in this affidavit information I have learned from these officers and agents, as well as information I have learned from my own efforts and observations, that I believe necessary to demonstrate there is probable cause to believe that Oscarlin Peguero Ortiz committed the crime alleged in the accompanying complaint. I have not included every fact known to me concerning this investigation.

## INVESTIGATION AND PROBABLE CAUSE

5.      In January 2020, Detective Stephen Charles of the Franklin County Sheriff's Office received information that an individual (hereinafter, "Subject 3") and her significant other (hereinafter, "Resident 2") had moved into a residence in Avon in Franklin County. Detective Charles subsequently determined that residence was located at 887 River Road in Avon, Maine ("the residence"). Based on prior information and investigation, Detective Charles was aware that Subject 3 and Resident 2 may have out-of-state connections to sources of controlled substances.

6.      Detective Charles and other law enforcement officers with the Franklin County Sheriff's Office and the Farmington Police Department periodically drove past the residence and observed the following, among other things:

a.    On February 21, 2020, Detective Charles observed a vehicle at the residence. The vehicle was registered to an individual identified hereinafter as Subject 1.

b.    On May 14, 2020, a detective with the Farmington Police Department observed a vehicle backed into the driveway of the residence. The vehicle was rented in the name of Subject 1.

c.    On May 15, 2020, Detective Charles observed several motor vehicles come and go from the residence after short-duration visits.

d.    On May 29, 2020, a deputy observed a vehicle at the residence but was not able to obtain the vehicle's Connecticut plate number. On May 30, 2020, the deputy drove past what appeared to be the same vehicle with a Connecticut plate. The vehicle was rented in the name of Subject 1.

7.      Based upon information obtained in the course of an ongoing investigation, Detective Stephen Charles of the Franklin County Sheriff's Office obtained a State of Maine warrant to search the residence, identified as the rented residence of Subject 3 and Resident 2.

8.      On July 17, 2020, the Franklin County Sheriff's Office, the Farmington Police Department, the Maine Drug Enforcement Agency, and the Maine State Police executed the state warrant at the residence. I assisted in the execution of that warrant. From my observations that day, conversations with other involved officers and agents, and review of reports prepared by other involved officers and agents, I learned the following information.

Page **3** of **8**

9.       At the time the warrant was executed, officers located Subject 3, Subject 1, and Peguero Ortiz in the living room of the residence. Subject 3 was seated on a bed in the living room, with Subject 1 in a chair on the opposite side of the living room and Peguero Ortiz approaching a back door of the residence. No other persons were located within the residence.

10.      Among other items, officers seized the following from the living room[1] of the residence:

   a.   A bag of eighteen individual baggies containing a white substance was found on the floor next to the bed. Subsequent laboratory testing determined the bag contained approximately 5.545 grams of a mixture including cocaine base.[2,3]

   b.   $160 in U.S. Currency was found on the couch.

   c.   Straws and baggies were found on the couch.

   d.   Small bags and a digital scale were found on the couch.

   e.   $6,025 in U.S. Currency was found on a footstool in front of a chair.

   f.   Six bags containing white powder chunks were found on a side-table next to where Subject 1 was sitting. Subsequent laboratory testing determined the baggies contained approximately 1.885 grams of cocaine base.

---

1 From a purse—identified as belonging to Subject 1—in the living room, officers seized a bag containing several smaller bags totaling approximately 44.9 grams of a mixture containing heroin and fentanyl, as well as multiple smaller baggies totaling approximately 12.651 grams of a mixture containing cocaine base. Officers also seized $1,200 in U.S. Currency from Subject 1's person.

2  I am aware that those involved in the distribution of controlled substances frequently separate larger quantities of controlled substances into smaller amounts for the purpose of easily conducting sales of personal-use quantities to customers.

3 Based on my training and experience, I am aware that "crack" is a common street name for cocaine base.

g.   Four bags containing smaller baggies of white powder were found behind another chair. DEA's Northeast Laboratory subsequently identified two separate exhibits within these seized items:

i.   One exhibit contained sixty-one baggies. Laboratory testing determined the baggies contained approximately 20.009 grams of cocaine base.

ii.   One exhibit contained twenty-two baggies. Laboratory testing determined that no controlled substance was identified in fifteen units tested of twenty-two units received.

h.   An individual baggie containing white powder was found on the floor. Subsequent laboratory testing determined residue was present containing heroin and fentanyl.

i.   A digital scale was found on the floor by couch. Another digital scale was found on the coffee table.[4]

j.   White powder was found on the table by the couch. It was not submitted for testing.

k.   A sharps container of miscellaneous needles was found on the couch.

l.   A mason jar containing a white-powder residue was found behind the couch. It was not submitted for testing.

---

4 I am aware that individuals involved in the distribution of controlled substances frequently utilize digital scales to weigh quantities to be packaged for sale.

m.  Multiple cellular phones[5] including: an iPhone on the floor; two iPhones in the purse containing Subject 1's identification; an iPhone next to the purse containing Subject 1's identification; an iPhone on the couch (believed to belong to Subject 3); and an LG phone on the couch.

11.    According to Maine State Police Trooper Reid Bond, who remained in the living room with Subject 3, Subject 1, and Peguero Ortiz while other officers cleared the residence, several of these items were visible in plain view in the living room. Those items included a small amount of white powder next to a hypodermic needle on the coffee table, several small baggies containing white powder packaged consistent with cocaine and heroin, and a large amount of cash stacked on the ottoman.

12.    In a room identified as used by Peguero Ortiz, officers seized a purple backpack. Within the backpack, officers located $1,532 in U.S. Currency, a bag containing (based on laboratory testing) approximately 0.317 grams of a mixture containing heroin and fentanyl, and a pair of jeans. Within the jeans, officers located four bags containing (based on laboratory testing) approximately 39.817 grams of a mixture containing heroin and fentanyl.

13.    During a *Mirandized* interview, Peguero Ortiz disclosed, in summary and in part:

a.  He was staying in the residence. He estimated he had been coming to the residence for three or four weeks and staying for three-to-four days at a time. He gets paid to stay at the residence.

---

5 One additional iPhone was located in the bedroom identified as used by Peguero Ortiz, and an additional cellular phone was seized in a bedroom on the second floor.

b.    He had property in the residence, including a couple of shirts, a purple bag, some sweats, and two pairs of sneakers.

c.    He denied having any jeans and claimed that some clothes belonged to another male who was staying there. He also denied the bedroom where the purple backpack was found was his, claiming he sometimes stayed upstairs but that he was barely at the residence, staying for two, three, or four days before leaving.

d.    He subsequently acknowledged that he was at the residence to watch Subject 3 to make sure she "don't touch nothing too crazy, you know." Subject 3 takes care of the money, and he holds the drugs. He gives the drugs—including crack and heroin—to Subject 3, who gives them to customers who come to the residence. He later claimed that he did not hold the drugs and that he just watched them, claiming Subject 3 kept the drugs in a safe in the bedroom.

e.    He denied knowing of any crack currently in the residence. He subsequently acknowledged that he supervises Subject 3—watching her sell the crack and heroin—and that he was aware there were drugs in the residence.

14.    Based upon my training, education, and experience, I submit there is probable cause to believe that Oscarlin Peguero Ortiz actually or constructively possessed, solely or jointly, the controlled substances identified above. I further submit that Oscarlin Peguero Ortiz's intention to distribute the controlled substances is demonstrated by the presence in the living room of significant amounts of U.S. Currency, three digital scales, small bags consistent with the type commonly utilized by drug traffickers to package controlled substances for distribution, and the amount of controlled substances and the manner in which they were packaged. Officers

seized multiple bags containing many smaller baggies of mixtures containing controlled substances. I am aware that those involved in the distribution of controlled substances frequently separate larger quantities of controlled substances into smaller amounts for the purpose of easily conducting sales of personal-use quantities to customers. Those involved in the distribution of controlled substances frequently utilize digital scales to weigh quantities to be packaged for sale. Additionally, Peguero Ortiz admitted that he was paid to stay at the residence for the purpose of supervising Subject 3's distribution of crack and heroin.

15.     Based upon the foregoing, I submit there is probable cause to believe that Oscarlin Peguero Ortiz violated Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2.

I, Scott Rochefort, hereby swear under oath that the information set forth in this affidavit is true and correct to the best of my knowledge, information, and belief, and that I make this oath under the pains and penalties of perjury.

Dated at Bangor, Maine this 3rd day of August, 2022.

Scott Rochefort
Special Agent,
U.S. Drug Enforcement Administration

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date: **Aug 03 2022**

City and state: Bangor, ME

_Judge's signature_

John C Nivison U.S. Magistrate Judge
_Printed name and title_

Page **8** of **8**